No. 36,483

Lucillous Betts et al., *Appellants,* v. G. G. Easley et al., *Appellees.*

(169 P. 2d 831)

460

Opinion filed June 8, 1946.

*William H. Towers, Elmer C. Jackson, Jr.,* and *Roy C. Garvin,* all of Kansas City, were on the briefs for the appellants.

*William E. Carson,* of Kansas City, and *Arthur L. Ross,* of Kansas City, Mo., were on the briefs for the appellees.

The opinion of the court was delivered by

Hoch, J.: The primary question here presented is whether a labor organization which has been regularly designated, under the Railway Labor Act, as the collective bargaining agent for all the workmen involved, can lawfully exclude eligible Negro workmen from full participation in privileges incident to the act and admit them to membership only in a "separate lodge" which "shall be under the jurisdiction of and represented by the delegate of the nearest white local." Negro workmen affected—railway carmen—sought to enjoin such action by the labor union, so designated as the bargaining agent, and named as defendants the officers, national

and local, of the union, and also the employer, the railway company. The officers of the local lodge of the union demurred to the petition, the demurrer was sustained, and the plaintiffs appeal.

The issue being here upon demurrer, all allegations of fact well pleaded in the petition must be accepted as true. It will suffice to summarize the allegations. The plaintiffs—six in number—are Negro employees of the Santa Fe railway company in its Argentine shops in Kansas City, Kan. They bring the action in their own behalf and—under the authority of section 60-413, G. S. 1935—in behalf of and for the benefit of the other one hundred or more Negro employees similarly situated. Formal averments relating to the identity of those named as officers of the defendant labor unions and other such matters need not be recited.

The workmen employed by the Santa Fe in the Argentine shops were formerly organized into what was known as a company union, and during the existence of the company union, Negro employees were given full membership in the union along with the white employees. They were in no way discriminated against and participated fully in the election of officers and in the transaction of the business of the union.

In November, 1943, in harmony with procedure prescribed in the Railway Labor Act, the Mediation Board, constituted under that act, conducted in the Argentine shops an election by secret ballot, participated in by all employees involved, for the purpose of determining what labor organization should become the authorized collective bargaining representative of such employees in negotiations with the employer, as contemplated by the act. As a result of this election, the Grand Lodge Brotherhood Railway Carmen of America was chosen and officially designated as such collective bargaining agent. Pursuant to the requirements of the law, the Mediation Board certified the result to the railway company and subsequent thereto the officers of the grand lodge sent their representative, Mott L. Fox, to Kansas City for the purpose of organizing a local lodge "for and on behalf of all the employees at the Argentine shops of the defendant Railroad Carrier." The activities of said representative Fox resulted in the organization of Local Lodge No. 850 of the Brotherhood Railway Carmen of America. In soliciting memberships in the local lodge, Fox assured the plaintiffs and the other Negro employees that they would be entitled to full membership in Local Lodge No. 850. Pursuant to these promises, plain-

tiffs and those whom they represent in this action "took out membership in the said Local Lodge No. 850." In this connection the petition alleges:

"As it subsequently developed, the defendants herein named, had no intention at the time they secured these plaintiffs' memberships, of admitting nor integrating these plaintiffs nor the rest of the Negro employees at the Santa Fe shops into the Brotherhood Railway Carmen of America."

Contrary to the assurances heretofore recited, Fox posted a notice on January 20, 1944, informing the employees of the Argentine shops that a meeting would be held on January 20, 1944, at a designated time and place "to form a Santa Fe local for white employees only" and that a meeting would be held on January 25, 1944, "to form a separate local lodge for Negro employees only."

Since the organization of Local Lodge No. 850, the defendants have refused to admit the plaintiffs and other Negro employees to full membership in the local lodge although they have paid their membership dues, and—

"Said defendants have insisted and still insist, and are determined to coerce and to force these plaintiffs and the other Negro employees who are members of said Local Union, to accept membership in a separate, subservient and substandard organization known as a separate or auxiliary lodge for colored employees only."

Plaintiffs assert, in the petition, that the division and classification of employees as above indicated "is not based on experience and skill, but entirely on race and color, and for that reason said division and classification is illegal, unreasonable and arbitrary" and that the alleged acts of exclusion and discrimination were and are being done under a provision of the constitution and bylaws of the defendant union which reads as follows:

"On railroads where the employment of colored persons has become a permanent institution they shall be admitted to membership in separate lodges. Where these separate lodges of Negroes are organized they shall be *under the jurisdiction of and represented by the delegate of the nearest white local in any meeting of the Joint Protective Board, Federation or Convention where delegates may be seated.*" (Brotherhood Railway Carmen, Subordinate Lodge Constitution, Ed. 1941, section 6, clause C.) (Italics supplied.)

Further allegations particularizing the acts of discrimination may be summarized as follows:

The separate Negro lodge is not permitted to transact its own business, but must be under the absolute jurisdiction of the nearest white local lodge.

Negro workmen, eligible to membership (a) are not permitted to attend meetings of Local Lodge No. 850 nor to vote on the election of any officers or on anything pertaining to the business of the grand or local lodge; (b) are not permitted to participate in any determination of policy; (c) are not permitted to vote upon the question of the amount of dues to be paid by members of the union; (d) are not permitted to vote in the selection of those who are to represent them; (e) cannot be delegates in any meeting of the Joint Protective Board, federation or to any meeting or convention where delegates may be seated, but must be represented by a delegate or delegates selected by the white lodge.

Plaintiffs assert, in the petition, that the matters involved are affected with a public interest, and that the division, classification and discrimination alleged tends to public injury and is repugnant to public policy.

It is further asserted in the petition that the plaintiffs and their fellow Negro workmen have paid for membership; that they are law-abiding citizens of good character and possess the qualifications to be full members; that they are willing to pay the necessary initiation fees, all dues and assessments and to comply fully with all requirements of the union, but are being denied this full membership solely because of their race or color.

It is asserted in the petition that the acts complained of are oppressive and force the Negro members to surrender their fundamental and constitutional rights, and "tend to the impoverishment of the Negro members and to the enrichment of the white members of the defendant Unions"; that they "tend to reduce the Negro members . . . to economic involuntary servitude" contrary to the fifth, thirteenth and fourteenth amendments; that they constitute "a palpable abuse of the power reposed in the defendant Unions and the other defendants herein, by the laws of the United States of America, and the laws of the state of Kansas," and are in violation of sections 1 and 18 of the Kansas bill of rights.

The petition alleges that unless the defendants are restrained from enforcing the provisions of the constitution referred to, the plaintiffs "will be irretrievably damaged and will also be deprived of their liberties, personal rights and property rights without due process of law."

Similarly, plaintiffs allege that their fundamental rights will be violated, to their injury, if the defendant union is not enjoined

from acting as the bargaining agent for the employees as long as the plaintiffs and other Negro employees are not given equality in privileges and participation in union affairs.

For similar reasons an order is asked against the railway company to restrain it from recognizing the union as a collective bargaining agency as long as the acts of alleged discrimination are being committed.

Petitioners assert that they invoke the equitable remedy of injunction because they have no adequate remedy at law.

The prayer of the petition is that the defendants be restrained "from continuing to enforce the particular provision of the constitution and bylaws, viz.: section 6, clause (c) of the subordinate lodge constitution, which divides and classifies the members of said labor unions on the basis of race and color"; that the defendants be restrained—

"From being the Bargaining Agent or Agents, or representative or representatives as individuals or as a committee or plan to deal with the defendant the Atchison, Topeka and Santa Fe Railway Company for and on behalf of the employees at the Argentine shops of the aforesaid Railroad Company, concerning grievances, labor disputes, wages, rates of pay, hours of employment, or any other condition of work, unless and until the said defendants, each and all of them, give these plaintiffs and all the other Negro members whom they represent herein, equality of privileges and participation in the affairs of the said defendant Labor Unions, and give them full membership in the same; also restraining said defendants, and each of them, from segregating these plaintiffs, and all whom they represent, into a separate lodge; and that the said restraining order run until such time as the court can hear, determine and decide plaintiffs' application for a temporary injunction, the time for said hearing to be on or about the —— day of ————, 1944."

Corresponding relief is prayed for upon the hearings for temporary and for permanent injunctions.

The trial court, in sustaining the demurrer, filed a memorandum opinion, from which we take the following excerpts:

"It appears that *membership in the Brotherhood in question is voluntary, not compulsory, and that by a secret ballot of all the employees of the Santa Fe shops, white and colored, the Brotherhood was selected by a majority of said employees as the sole bargaining agency for them, as provided by the Railway Labor Act.*

"Under the decisions presented, it appears clear that the Fifth Amendment to the United States Constitution relates only to Governmental actions, Federal in character, not to any action of private persons; and that the Fourteenth Amendment relates only to actions by State governments (271 U. S. 323; 109 U. S. 3).

"In the opinion of the Court, *the things complained of* by the plaintiffs *re-*

*late to the action by a private association of individuals, and not by the Federal Government or the State of Kansas. This being true, the Fifth and Fourteenth Amendments do not seem to be violated.* This was held in *Grovey v. Townsend,* 295 U. S. 45. The 13th Amendment, prohibiting slavery, does not apply.

"The same section 6-(C), of the constitution of the Brotherhood of Railway Carmen, complained of by the plaintiffs herein, was considered at length in the National Federation case, 110 F. 2d 537-538, and it was there held that it did not offend the Constitution of the United States, and the decision of the U. S. District Court was affirmed in its decision dismissing the complaint.

"Section 1 of the Bill of Rights of Kansas provides for equal rights, life, liberty, and the pursuit of happiness. Section 18 provides for justice without delay, remedies by ·due course of law for injuries in person or property or reputation. In the opinion of the Court, these two sections do not reach or give a cause of action for the complaint of the plaintiffs herein.

*"It does not appear on the face of the plaintiffs' petition that they or any of them have been deprived of the right to earn a livlihood,* as it appears that the plaintiffs contend. *Nor does it appear that the plaintiffs have been or will be damaged in person or property in such a substantial way as to warrant injunctive relief* of the nature prayed for in this action." (Italics supplied.)

The grounds upon which the trial court rested its order cover substantially the contentions now urged by appellees and controverted by appellants. Various incidental issues are raised to which some reference will later be made.

Before considering the fundamental and controlling questions presented, it is well to make clear at the outset that the pleadings raise no abstract question as to the power of the union to segregate its white and colored members. To what extent the union may lawfully segregate its membership on the basis of race, color, or any other basis it chooses, in connection solely with local activities which are wholly independent of its functions as the designated bargaining agent, is a question not before us. We are here concerned with a segregation which carries with it alleged inequality of participation in union affairs relating to hours, wages, grievances, working conditions, and other such important matters incident to employment, which are within the scope of negotiation and settlement under the Railway Labor Act.

The questions here may be variously stated as follows:

Is the defendant labor union, in performing its functions as a collective bargaining agent, to be regarded solely as a "private association of individuals" free from the constitutional and statutory restraints which attach to public agencies?

Does the fact that membership is voluntary relieve the union

from an obligation, as a collective bargaining agent, to accord to all members equal privileges in connection with its acts and transactions as such agent?

May the union, acting in its capacity as a collective bargaining agent, lawfully deny equal participation and representation to some of its members because of race or color?

Does the denial of such equal participation and representation constitute a denial of individual rights under the constitution and the statutes?

Assuming that the plaintiffs participated in the election which resulted in the selection of the defendant union as the collective bargaining agent, are they thereby estopped from asserting a right of equal participation and representation?

Is injunction a proper remedy under the allegations of the petition?

That we are here dealing with acts and transactions affected with a public interest is too clear to require extended comment. The Railway Labor Act was passed by congress in the exercise of its constitutional power to regulate interstate commerce. The legislative intent is specifically stated in the act itself as follows:

"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." (45 U. S. C. A. § 151a.)

One of the leading cases in point is *Virginian Ry. v. Federation*, 300 U. S. 515, 81 L. Ed. 789, in which the history and purpose of the legislation are extensively treated. In the opinion it was stated that "In 1926 Congress . . . made a fresh start toward the peaceful settlement of labor disputes affecting railroads, by the repeal of the 1920 act and the adoption of the Railway Labor Act"; that the act encouraged amicable adjustments by voluntary submission to arbitration and supported that policy "by the imposition of legal obligations"; that the act prohibited, under certain circumstances, any change in conditions by the parties to an unadjusted

labor dispute for a period of thirty days, except by agreement; that the act gave full recognition to the right of collective bargaining by employees through their own representatives chosen without interference, influence, or coercion; that the act, as originally enacted and as subsequently amended, provides for a Mediation Board, one of whose duties is to conduct an election by secret ballot—under circumstances set out in the statute—in which the employees involved select their bargaining agent, and to certify the result of such selection to the employing carrier; that upon such certification the carrier is required to "treat with" the bargaining agent so selected. By these and other provisions of the act, congress set up machinery for the adjustment of railway labor disputes and in doing so, not only established the right of collective bargaining through representatives freely chosen, but at the same time imposed obligations and responsibilities upon such agencies created under the act. (As to purposes of the act, see cases cited 45 U. S. C. A., pp. 992, 993.)

In the light of the history and purpose of the act, as construed in many decisions, the trial court's view that the acts complained of are solely those of "a private association of individuals" is wholly untenable. The acts complained of are those of an organization acting as an agency created and functioning under provisions of federal law. This being true, it is unnecessary to consider appellees' contention that the fifth amendment is not here applicable because it relates only to action by the federal government and not to acts of private persons. Nor do we need to inquire whether appellees' statement as to the operation of the fifth amendment is too broadly stated. In any event the constitutional guaranties of due process, whether under the federal or state constitutions, are to be liberally construed to effectuate their purposes, and are a restraint not only upon persons holding positions specifically classed as executive, legislative or judicial, but upon all administrative and ministerial officials who act under governmental authority. (16 C. J. S. 1148, 1149, and cases cited, Note 61.) While claiming and exercising rights incident to its designation as bargaining agent, the defendant union cannot at the same time avoid the responsibilities that attach to such statutory status.

The many specific allegations as to denial of equal participation and representation in the affairs of the union as a bargaining agent need not be repeated. Clause (C), section 6 of the constitution

of the defendant union shows gross discrimination upon its face. The "separate lodges," to which alone Negro workmen are permitted membership, "shall be under the *jurisdiction of* and *represented by* the delegate of the *nearest white local,* in any meeting of the Joint Protective Board, federation or convention *where delegates may be seated.*" (Italics supplied.) These words speak for themselves.

At this point it should be made clear that when the majority of the craft or class involved have chosen their collective bargaining agent, such agent becomes, under the law, the *sole* bargaining agent for all the workmen. No minority group is permitted to have its own representative to negotiate for it. (*Virginian Ry. v. Federation,* supra; *Steele v. L. & N. R. Co.,* 323 U. S. 192, 65 S. Ct. 226, 89 L. Ed. 173, and cases cited on pages 200-202.) It is apparent, therefore, that when the Negro workmen, segregated into a separate lodge *under the jurisdiction* of the *nearest white local,* are not permitted to participate in meetings "where delegates may be seated," they are denied rights and privileges accorded to white workmen in vital matters subject to negotiation and adjustment under the act.

It is urged, however, that since membership in the union is voluntary and not compulsory, the petitioners have no right to complain about limitations placed upon membership under the constitution and bylaws of the union. The argument is specious and unrealistic. Note might here be taken of the allegation that in soliciting members, prior to organization of the local lodge, the organizer assured the plaintiffs that all members would have equal rights and privileges. But passing that, we come to a more fundamental matter. This court cannot be blind to present-day realities affecting labor in large industrial plants. The individual workman cannot just "go it alone." Every person with an understanding of mass production and other features of modern industry long ago recognized the necessity of collective bargaining by labor representatives, freely chosen, if human rights are to be adequately safeguarded. In the Railway Labor Act, congress gave clear and firm recognition to this necessity. This liberal and enlightened view having been written into the statute, it must follow that a union acting as the exclusive bargaining agent under the law, for all employees, cannot act arbitrarily, cannot deny equality of privilege, to individuals or minority groups merely because membership in the organization is voluntary. To hold otherwise would do violence to basic principles of our American system. In *Steele v. L. & N. R. Co.,* supra,

the United States supreme court said: "But we think that Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of the craft, to represent the craft, *did not intend to confer plenary power upon the union to sacrifice,* for the benefit of its members, *rights of the minority* of the craft, without imposing on it any duty to protect the minority." (Italics supplied.) Syllabus 1 of the case reads:

"The Railway Labor Act *imposes on a labor organization, acting* by authority of the statute *as the exclusive bargaining representative* of a craft or class of railway employees, *the duty to represent all the employees in the craft without discrimination because of their race,* and the courts have jurisdiction to protect the minority of the craft or class from the violation of such obligation." (Italics supplied.)

The case here does not, under the allegations, involve denial of seniority rights, as in the Steele case, but it does involve a similar issue of racial discrimination. The petition alleges not only that Negro employees are denied the right to take part in such local affairs of the union as the election of officers and the fixing of dues, but are denied the right to participate in determining the position to be taken by the union, as bargaining agent for all employees, as to wages, hours, working conditions, and such other matters vitally affecting their economic welfare. Such denial is repugnant to every American concept of equality under the law. It is abhorrent both to the letter and the spirit of our fundamental charter. Never was it more important than now to reject such racial discrimination and to resist all erosions of individual liberty. The acts complained of are in violation of the fifth amendment.

Little need be added concerning the contention that plaintiffs are estopped from complaining about clause (C) of section 6, *supra,* because they participated in the election. In the first place, there is nothing in the petition to indicate that they knew, prior to the election, that there was such a provision in the constitution of the Brotherhood. On the contrary, the allegations indicate otherwise. But even if it could be said that they did have such knowledge, and that they voted for the Brotherhood as bargaining agent—which cannot be said, under the allegations—plaintiffs would still be entitled to assert their cause. The situation in which they find themselves must be viewed realistically. Without such appraisal of facts and circumstances, courts would often have been unable, through the years, to safeguard the rights of individuals and minorities.

Mere technical arguments, which disregard realities, speak with feeble force when basic freedoms are jeopardized.

Under the allegations, injunction is unquestionably a proper remedy. Plaintiffs allege that fundamental personal rights are now being denied them. Having concluded that the alleged acts do constitute such denial, it is clear that no adequate remedy at law exists and appellees specify none. In analogous situations the right of injunctive relief under the Railway Labor Act has been clearly established by the United States supreme court in *Steele v. L. & N. R. Co.*, supra, and in *Tunstall v. Brotherhood*, 323 U. S. 210, 89 L. Ed. 187. (See, also, *Bautista v. Jones*, 25 Cal. 2d 746, 155 P. 2d 343, and *James v. Marinship Corp.*, 25 Cal. 2d 721, 155 P. 2d 329.)

Appellees rely principally upon *National Federation of Ry. Workers v. National M. Board*, 110 F. 2d 529. This was a decision on January 8, 1940, by the United States court of appeals for the District of Columbia. Appellees say that they rely on this case because it "squarely passed upon the *same* constitutional questions raised in this case; *and because the supreme court on May 6, 1940, denied certiorari.*" We need not here discuss the suggestion that denial of certiorari in the National Federation case necessarily implied approval of the case on its merits by the United States supreme court. Suffice it to say that the conclusion may well be questioned. The general rule as to issuance of the writ of certiorari by the United States supreme court is stated as follows in 36 C. J. S. 109:

"The jurisdiction of the supreme court to review judgments or decrees of the circuit court of appeals by certiorari is a jurisdiction to be exercised entirely in the discretion of the court, sparingly, and only in extraordinary cases of peculiar gravity and general importance, or in order to secure uniformity of decision; and in the application of these rules certiorari has been granted or refused in a variety of cases."

Passing that question, however, we cannot agree with appellees that in the National Federation case the circuit court considered and determined the same constitutional question that we have here. The opinion in that case clearly shows the contrary to be true. The case involved several questions, including the regularity of an election to determine the collective bargaining agent of certain railway employees and other questions not necessary to mention here. Coming to the constitutional question raised in the case, the court quoted clause (C), section 6, the one here involved, and then said:

"Its constitution thus seems to indicate that colored participation in the Brotherhood is limited to membership in these separate lodges, and *the Fed-*

*eration contends that Brotherhood representation means that the officers bargaining with the carrier in behalf of the coach cleaners will not be colored."* (Italics supplied.) (p. 537.)

Further on in the opinion, the court stated specifically the issue before it as follows:

"In the last analysis, *the Federation's contention reduces itself to the proposition that the members of every race* in a craft of workmen *have a constitutional right to representation by one of their own race,* which neither the majority of the craft nor their own race may take from them." (Italics supplied.) (p. 538.)

In other words, the plaintiffs were there contending that they had a right under the act to be represented in negotiations with the employer by one of their own race. That is not at all the issue here. Appellants do not contend that they have a right to select a bargaining representative who will represent their minority group. They do not say that Negro employees have a right to be represented by Negro bargaining agents. On the contrary, they assert that the defendant union has the right to represent them as well as the other employees involved. What they do say is that they are not only placed under the jurisdiction of the nearest white local, but that they are not permitted to be represented in any meeting of the union where delegates are seated, are not permitted to help select officers, nor permitted to participate in the determination of policy, and that this denial of equal participation and representation is a violation of their constitutional rights.

Even if the National Federation case, *supra,* could be considered to support appellees' contention here, it would not now be persuasive in view of what was said more than four years later by the United States supreme court in *Steele v. L. & N. R. Co.,* supra, decided in December, 1944. But before discussing the latter case, we note incidentally that the circuit court in the National Federation case cited *Grovey v. Townsend,* 295 U. S. 45, 79 L. Ed. 1292, and that appellees now cite it in support of their contention that the union may limit the rights of its colored members without offending the limits of the constitution. Whatever might be said about *Grovey v. Townsend,* it was specifically overruled by the United States supreme court in *Smith v. Allwright,* 321 U. S. 649, 88 L. Ed. 987.

We have hereinbefore quoted briefly from *Steele v. L. & N. R. Co.* A large part of what was said in the opinion in that case might well be quoted here. A few excerpts will demonstrate how com-

pletely, in that case, the United States supreme court has answered essentially the same issue that this appeal presents. The action was brought by a colored locomotive fireman against the Brotherhood of Locomotive Firemen and Enginemen which had been designated as bargaining agent under the Railway Labor Act, to enjoin certain acts by the defendant which he alleged resulted in depriving him of seniority rights. Speaking for a unanimous court, Mr. Chief Justice Stone stated in the opening paragraph of the opinion:

"The question is whether the Railway Labor Act . . . imposes on a labor organization, acting by authority of the statute as the exclusive bargaining representative of a craft or class of railway employees, the duty to represent all the employees in the craft without discrimination because of their race, and if so, whether the courts have jurisdiction to protect the minority of the craft or class from the violation of such obligation."

The court then discussed at length the fundamental purposes and principles of the legislation. We quote the following from the opinion:

"While the majority of the craft chooses the bargaining representative, when chosen it represents, as the Act by its terms makes plain, the craft or class, and not the majority. The fair interpretation of the statutory language is that the *organization chosen to represent a craft is to represent all its members,* the majority as well as the minority, and *it is to act for and not against those whom it represents.* It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf, and that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed.

"We think that *the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents,* cf. *J. I. Case Co. v. National Labor Relations Bd.,* supra [321 U. S. 332, 335, 88 L. Ed. 766, 64 S. Ct. 576], *but it has also imposed on the representative a corresponding duty.* We hold that the language of *the Act* to which we have referred, read in the light of the purposes of the Act, *expresses the aim of Congress to impose on the bargaining representative* of a craft or class of employees *the duty to exercise fairly the power conferred* upon it in behalf of all those for whom it acts, *without hostile discrimination against them."* (Italics supplied.) (p. 202.)

In a concurring opinion, Mr. Justice Murphy said:

"The constitutional problem inherent in this instance is clear. Congress, through the Railway Labor Act, had conferred upon the union selected by a

majority of a craft or class of railway workers the power to represent the entire craft or class in all collective bargaining matters. *While such a union is essentially a private organization, its power to represent and bind all members of a class or craft is derived solely from Congress.* The Act contains no language which directs the manner in which the bargaining representative shall perform its duties. But *it cannot be assumed that Congress meant to authorize the representative to act so as to ignore rights guaranteed by the Constitution. Otherwise the Act would bear the stigma of unconstitutionality under the Fifth Amendment in this respect.* . . .

"The Constitution voices its disapproval *whenever economic discrimination is applied under authority of law against any race, creed or color.* A sound democracy cannot allow such discrimination to go unchallenged. Racism is far too virulent today to permit the slightest refusal, in the light of a Constitution that abhors it, to expose and condemn it wherever it appears in the course of a statutory interpretation."

Appellants stress the recent California case of *James v. Marinship Corporation,* supra. The case involved the National Labor Relations Act instead of the Railway Labor Act and the factual situation was quite different, but the fundamental issue of discrimination against Negro employees was in substance the same as we have here. The action was in injunction to prevent the defendant, a shipbuilding corporation, from discharging certain Negro employees because they were not members of a labor union with which the employer had a closed shop agreement, the union not granting full membership privileges to Negroes. There can be, in theory at least, no closed shop under the Railway Labor Act, since the act specifically prohibits making membership or nonmembership in a union a condition of employment, and does not forbid dealings between the carrier and an individual employee. The California case discusses extensively, however, the whole fundamental question of discrimination with extensive citation of authorities and much that was there said might well be quoted here. The following quotations from the opinion are especially pertinent:

"First, as alleged in the complaint, Local No. 6 'controls, manages and supervises all of the affairs and business of Auxiliary A-41.' Non-Negro locals are expressly declared in the by-laws to be the 'supervising' lodges. The auxiliary, however, has no voice nor vote in the affairs of Local No. 6, The Negroes are thus deprived of the right to participate in the determination of vital union policies and, as alleged, the auxiliary has no 'authority or autonomy with respect to its own affairs.'

. . . . . . . . . . . . . . .

"While it is true that a minority may properly be outvoted, minority members are nevertheless entitled to vote and participate in the affairs of the whole group, and certainly they cannot be forced into a non-participating,

isolated unit. It is urged by defendant that at the present time Negroes are employed under the same hours, wages and other working conditions as non-Negro employees. But one of the vital purposes of a labor union is to maintain the *continuance* of favorable conditions—to assure some security as to future employment practices; and, under the union regulations discussed above, the auxiliary is deprived of the customary union machinery essential to watch over and check at the outset future grievances and unequal changes in working conditions fostered by either the employer or the members of the non-Negro local. This is a serious and present discrimination against Negroes, certain to become an even greater handicap when temporary war employment ceases and shipyard jobs become more scarce.

. . . . . . . . . . . . . . .

"The discriminatory practices involved in this case are, moreover, contrary to the public policy of the United States and this state. The United States Constitution has long prohibited governmental action discriminating against persons because of race or color. 5th, 14th and 15th Amendments. It has recently been held that these provisions prohibit a political party from denying Negroes the right to vote in primary elections where, under state law, the political party is acting as an agency of the state in conducting the elections. *Smith v. Allwright,* 321 U. S. 649, 64 S. Ct. 757, 88 L. Ed. 987, 151 A. L. R. 1110. And in *Steele v. Louisville & Nashville R. R. Co.,* supra, 323 U. S. 192, 65 S. Ct. 226, 89 L. Ed. 173, the court held that the Railway Labor Act clothed the bargaining representative selected by employees with a power which, like that of the Legislature, is subject to limitations, and that, therefore, such representative could not be permitted to discriminate against a minority group of employees because of race." (pp. 737, 739.)

In a companion case, *Bautista v. Jones,* supra, decided December 30, 1944, the supreme court of California again examined extensively the question of arbitrary discrimination in union membership as a violation of constitutional rights, and followed the Marinship decision. These cases were again followed in *Thompson v. Moore Drydock Co.,* (Cal. 2d), 165 P. 2d 901, and *Williams v. International Brotherhood,* (Cal. 2d), 165 P. 2d 903.

The rule is firmly imbedded in American law that the guaranty of due process—whether under the fifth amendment, as a limitation upon the power of the federal government, or under the fourteenth amendment, as a limitation upon the power of the states—is to be liberally construed to effectuate its purpose of protecting the citizen against arbitrary invasion of his rights of life, liberty and property. (12 Am. Jur. 262, 271; 16 C. J. S. 1150.) Certainly the denial to a workman, because of race, of an equal voice in determining issues so vital to his economic welfare, under the Railway Labor Act, is an infringement of liberty if indeed it may not also be said to be a deprival of property rights. (*Cameron v. International &c., Union*

*No. 384,* 118 N. J. Eq. 11, 176 A. 692, 97 A. L. R. 594, and annotation on page 609.)   In the opinion in *Texas & N. O. R. Co. v. Ry. Clerks,* 281 U. S. 548, 571, 74 L. Ed. 1034, which involved the right of employees to organize and .choose their bargaining representative under the Railway Labor Act free from interference by the employing carrier, Mr. Chief Justice Hughes said, for the court:

"*If it could be said that it was necessary in the present instance to show a property interest* in the employees in order to justify the court in granting an injunction, we are of the opinion that *there was such an interest,* with` respect to the selection of representatives to confer with the employer in relation to contracts of service, as satisfied the statutory requirement." (Italics supplied.)

It is unnecessary to lengthen this opinion by discussing other cases cited by the parties, all of which have been examined, or pertinent cases which our own research has disclosed.   We find none which is disturbing to the conclusion here reached.

The contention that the trial court was without jurisdiction of the persons or of the subject matter of the action is clearly unsound.   State courts have not only the power but the duty to enforce rights secured by the constitution and laws of the United States when such issues are involved in proceedings before them.   21 C. J. S. 798, and many cases there cited, including *Mooney v. Holohan,* 294 U. S. 103, 79 L. Ed. 791, 55 S. Ct. 340, 98 A. L. R. 406, in which it was said:

"Upon the state courts, equally with the courts of the Union, rests the obligation to guard and enforce every right secured by that [Federal] Constitution." (p. 113.)

The denial of equal rights of participation and representation being in violation of the federal constitution, it is not necessary to consider the applicability of our state constitution and statutes.   It is enough to say that our law and our decisions are wholly in line with the guaranties of the federal constitution.   As to racial discrimination in transactions such as those here involved, our legislature has spoken specifically in section 44-801, G. S. 1943 Supp., which reads:

"No labor organization of any kind, agency or representative committee or plan, in which employees participate and which exists for the purpose, in whole ·or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or any other conditions of work, shall be the representative unit for the purpose of collective bargaining in the state of Kansas in any of the trades, crafts, skilled and unskilled, work,

labor or employment of any kind or capacity, which in any manner discriminates against, or bars, or excludes from its membership any person because of his race or color: *Provided,* That the provisions of this act shall not apply to labor organizations within the provisions of 48 U. S. Statutes 1186 and 49 U. S. Statutes 1189, Title 45, Sections 151 to 188, both inclusive."

We are not unmindful of the proviso in section 44-801, *supra,* which excludes labor organizations within the provisions of the Railway Labor Act. The proviso was obviously inserted in recognition of the fact that transactions of such organizations, having to do with interstate commerce, are covered by the provisions of the federal act. And we do not predicate this decision upon the Kansas statute. But the legislative view, implicit in the statute, is that such matters are of public concern, and that racial discrimination in collective bargaining which deeply affects the economic welfare of all employees involved is an intolerable invasion of individual rights.

The judgment is reversed with directions to overrule the demurrer.